William R. Kendall, Esq.
NV State Bar No. 3453
137 Mt. Rose Street
Reno, NV 89509
Phone: (775) 324-6464
Fax:    (775) 324-3735
email: kendalllaw@aol.com

Kevin T. Kennedy
Texas State Bar No. 24009053
2500 West Loop South, Suite 315
Houston, Texas 77027
(832) 303-3873
(713) 979-2003 (fax)
k.t.p.kennedy@gmail.com

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| LUXEYARD, INC.,<br><br>　　　　Plaintiff,<br><br>v.<br><br>KAY HOLDINGS, INC.,<br>SANO HOLDINGS, INC., AND<br>ROBERT WHEAT<br><br>　　　　Defendants. | Case No.:<br><br>**COMPLAINT** |

LuxeYard, Inc. ("LuxeYard") files this Complaint against Defendants Kay Holdings, Inc., Sano Holdings, Inc. and Robert Wheat (collectively referred to as "Defendants"), and in support, would respectfully show as follows:

**JURISDICTION AND VENUE**

1.     Jurisdiction is proper in this court because complete diversity exists between the parties and the damages sought are in excess of $75,000, excluding interest and costs.  This Court has both subject matter and personal jurisdiction over this case and the parties pursuant to 28 U.S.C. § 1332(a)(1).  Further, this Court has subject matter jurisdiction over this case because LuxeYard seeks relief pursuant to Section 16(b) of the Securities Exchange Act (the "Act"), 15. U.S.C. § 78p(b).

2. Venue is proper before this Court as Defendants Kay Holdings, Inc. and Sano Holdings, Inc. are resident citizens of Nevada and events giving rise to LuxeYard's claims against the Defendants occurred in part in Nevada. 28 U.S.C. § 1391(b)(1) and (2).

## INTRODUCTION

3. This case arises out of an organized, intentional, and unlawful "pump and dump" scheme involving LuxeYard stock. The scheme was orchestrated by a syndicate including the Defendants and their co-conspirators.[1]

## PARTIES AND SERVICE OF PROCESS

4. Luxeyard is a Delaware corporation doing business in Harris County, Houston, Texas.

5. Defendant Kay Holdings, Inc. ("Kay Holdings") is a Nevada corporation and may be served through its registered agent Sage International, Inc. at 1135 Terminal Way, Suite 209, Reno, Nevada 89502.

6. Defendant Sano Holdings, Inc. ("Sano Holdings") is a Nevada corporation and may be served through its registered agent Sage International, Inc. at 1135 Terminal Way, #209, Reno, Nevada 89502.

7. Defendant Robert Wheat is an individual who represents his address to the Nevada Secretary of State to be 1135 Terminal Way, # 209, Reno, NV 89502. Mr. Wheat is the sole shareholder, officer and employee of Defendants Kay Holdings and Sano Holdings. He may be served with process at 1135 Terminal Way, # 209, Reno, NV 89502.

## FACTS

A. <u>The Nature of the Case</u>

8. The phrase "pump and dump" refers to a scheme by which someone causes the price of a stock to be artificially inflated, and then sells the stock when it is highly valued. The purchasers who bought the stock (or any financial instrument that is tied to the stock price) at a high price are typically left with worthless or much lower-valued securities when the pump and dump scheme is

---

[1] LuxeYard has filed suit against Kay Holdings, Inc. and the Defendants' co-conspirators in Texas. Defendants Kay Holdings, Inc. successfully challenged jurisdiction in that lawsuit, necessitating the filing of this Complaint.

concluded.  In some cases, the "dump" includes efforts to put the target corporation out of business to negate the company's ability to pursue legal remedies.

9.     The Defendants' scheme to defraud was perpetrated from the summer of 2011 through the summer of 2012.  The goal of the Defendants' scheme was to enrich themselves and their co-conspirators at the expense of other LuxeYard investors and shareholders.

10.    The Defendants acted in concert with others to (i) control and dominate the market in LuxeYard stock, (ii) engage in coordinated trading activity (including the use of matched orders and wash trades), and (iii) create and distribute false promotional materials to the public.  These activities generated a false appearance of liquidity and investor interest in LuxeYard stock, thereby artificially inflating the trading volume and share price.

11.    The Defendants and their co-conspirators then sold LuxeYard shares at the increased price they falsely created through market manipulation.  The Defendants and their co-conspirators derived illegal trading profits totaling in excess of $30 million.

12.    The Defendants and other persons conspiring in the scheme utilized nominee brokerage and bank accounts in the names of corporate entities, trusts, relatives, and acquaintances to conceal their fraudulent activity.

13.    The Defendants, along with their co-conspirators, defrauded LuxeYard and its shareholders by representing that they were interested in growing the company and were committed to its success.

14.    The Defendants were also involved in a mass-marketing effort that falsely promoted LuxeYard stock, causing harm to unsuspecting investors who purchased LuxeYard stock based on the Defendants' misrepresentations.

15.    To understand the Defendants' illegal operation, the nature of public companies and stock ownership must be explained.  Stock represents an ownership interest in a company's assets and its future earnings.  In general, in an efficient market, stock prices are guided by the unfettered forces of supply and demand.  Reducing the supply of stock available to be purchased tends to increase the market price, as does generating more demand to purchase the stock by the use of promotional materials predicting large profits and recommending the stock as a "buy."  Conversely, increasing

the supply of stock available to be purchased tends to decrease the market price, as does driving down demand to purchases the stock.

16. Factors such as trading volume (*i.e.*, the number of shares traded in a day), financial estimates and reports, and news of events that might impact a company's business will affect investors' desire to own a company stock.

17. "Pump and dump" schemes use various devices to artificially increase the demand for stock (*e.g.*, engaging in matched orders, distributing promotional materials recommending that investors purchase the stock), and restrict the supply of stock available to be traded (*e.g.*, dominating and manipulating the market). Taken together, this increase in demand and a restriction of supply results in the artificial increase in the market price for the stock.

18. But not all stock can be publicly traded. It is illegal to publicly offer to sell stock absent registering the transaction with the Securities and Exchange Commission ("SEC") or meeting the legal requirements for a valid exemption from registration. Stock that cannot be publicly traded bears a restrictive legend. Transfer agents require a legal opinion letter stating that the restrictive legend can be removed and the factual basis for that opinion. Once the restricted legend has been removed and the stock is able to be publicly traded, it is known as "unrestricted stock." The stock obtained by the Defendants and their co-conspirators should have been restricted by virtue of SEC Rule 144, 17 CFR § 230.144. Through fraud, the Defendants and their co-conspirators were able to trade otherwise restricted stock as "unrestricted" shares in their overall pump and dump scheme

### B. The Creation of LuxeYard

19. In April of 2011, LY Retail, LLC ("LY Retail"), a Texas company, was founded by Amir Mireskandari who shared his idea with Khaled Alattar. LY Retail was set up to operate a website called LuxeYard.com ("the Site"). The Site is a flash sales site, selling high end luxury items on the internet. Sites like this one are generally referred to as curated collection sites.

20. LY Retail rapidly expanded its business and Mireskandari agreed that LY Retail needed to raise capital. Both Alattar and Mireskandari committed to find capital sources for the company.

21. Mireskandari spoke with financial advisor Fredrick Huttner about raising capital. Huttner introduced Mireskandari to a man by the name of Kevan Casey, a person introduced by Huttner as a professional investor.

### C. Acquisition of the Shell Corporation

22. Casey represented to Mireskandari that he could help the company locate investors to obtain capital, and would help the company with its operations and future growth. Unknown to Mireskandari, Casey already planned to engage in a pump and dump scheme to enrich himself and his investor group that he would bring to the table (many of whom had previous dealings with Casey in other pump and dump schemes).

23. Casey made representations to Mireskandari with the intent that he and others would believe them to be reasonable, rely upon them, and act upon them by investing in the company.

24. The concept pitched by Casey was to turn LY Retail and the LuxeYard.com business into a public entity (through a reverse merger), and in this manner they could raise capital, bring liquidity to the business, and provide working capital.

25. A reverse merger occurs when a private operating company is acquired by a non-operating public "shell" corporation. Subsequently, instead of merging into the public corporation, the private company takes control of operations of the public company and, usually, changes the name of the public entity to match the previously private company.

26. Casey enlisted Fredrick Huttner, Scott Gann, Jonathan Friedlander, and Jonathan Camarillo in the reverse merger process. On their behalf, the law firm of Anslow & Jaclin located a shell company called "Top Gear," a Delaware corporation with no revenue and limited operation.

27. Top Gear had approximately fifty shareholders primarily consisting of Israeli citizens. Top Gear's shareholders were willing to sell all of the company's shares for the price of approximately $464,000.

28. In order to facilitate the Top Gear purchase, Casey assembled a group of "investors" to fund the outright purchase of all outstanding Top Gear shares. In this endeavor, Casey and Gann were assisted by David Bahr, Fredrick Huttner and others.

29. The "investors" who purchased Top Gear knew about and supported Casey's intent to execute a pump and dump scheme. The "investors" included Robert Wheat through his company Kay Holdings.

30. Robert Wheat is Kay Holdings' sole shareholder, officer and employee.

31. Shares of Top Gear were given in exchange for the money provided to purchase the shell corporation. The investor group—including Kay Holdings—provided the majority of the capital while core organizers Casey and Huttner implemented the plan.

32. In November of 2011, Kay Holdings and the other "investors" knowingly financed the purchase of shell company Top Gear, which had no operations and no revenue. The "investors" wire-transferred money directly into Anslow & Jaclin's IOLTA account according to instructions provided by Casey. In return, the investors received shares of the shell company along with Casey (the "Original Shareholder Syndicate"). The Original Shareholder Syndicate collectively controlled and owned 100% of the Top Gear Shares. Amongst themselves, they agreed how shares would be apportioned.

33. Although Top Gear shares had almost no value on paper, the Original Shareholder Syndicate knew the shares would become valuable through their pump and dump scheme and provide a substantial return in a short time period. Shares that had no pre-fraud value would bring liquidity to the group through their coordinated marketing and trading efforts, thereby compensating everyone for either planning or funding the operation.

34. Members of the Original Shareholder Syndicate also made nominal investments directly into the company in order to help create an operating company, which they could then promote. Essentially, the Original Shareholder Syndicate was investing in a pump and dump scheme—not LuxeYard. This is evidenced by the fact that the Original Shareholder Syndicate began selling their shares in unison before LuxeYard was even fully launched. The "investors" sold their shares within days of commencement of a stock marketing and promotion campaign orchestrated by Casey and Friedlander in early April.

### D. Forging Unrestricted Shares

35. Although the shares obtained from the Top Gear purchase were restricted, the Defendants' transfer agents were able have the "restricted" legend removed.

36. Globex served as the transfer agent for the Top Gear securities. Globex obtained false opinion letters from law firms such as the Austin Legal Group that would have the effect of making the Top Gear stock "unrestricted."

37. Globex also invoked the assistance of Top Gear's previous President—Omar Shalom—who signed documents as President of Top Gear even though he was no longer President or even associated with Top Gear.

38. Since neither the attorneys nor Shalom had any authority or legal standing to draft, sign, circulate or distribute these "opinion letters," the act of doing so committed a blatant fraud on the SEC and the investing public at large.

39. Based on the authority contained within the opinion letters, the "unrestricted" shares were then divided among the Defendants and their co-conspirators. Some of these shares were hidden in nominee accounts or hidden under the names of different corporations in the United States and in offshore accounts in places such as Bermuda.

40. These "hiding" companies included Sano Holdings among others.

41. Sano Holdings acquired its shares in February of 2012.

42. Not all of the co-conspirators held only unrestricted shares. Some investors—including Kay Holdings—also made nominal, seemingly legitimate investments into the company to help fund operations. These investments were made, however, only to support Casey's financial commitments to LuxeYard and so the rest of the pump and dump scheme could be executed.

43. In the end, the Defendants and their co-conspirators controlled 100% of LuxeYard's unrestricted stock, which should have been restricted pursuant to SEC regulations.

44. After the Original Shareholder Syndicate acquired all the Top Gear shares, Mireskandari and Alattar were issued new, restricted shares in exchange for Top Gears' acquisition of LY Retail.

45. Top Gear then changed its name to LuxeYard, Inc.

46.	LuxeYard's officers, board members and employees were not aware of the Defendants' pump and dump plan and even solicited investments from others—including family and friends. In subsequent rounds of financing, innocent investors made direct investment into LuxeYard and would ultimately be injured by the Defendants' pump and dump scheme.

    E. Inflating the LuxeYard Share Price

47.	Casey, Huttner and their co-conspirators—including the Defendants—continued with their secret plans to pump and dump LuxeYard stock. However, they needed additional money to finance the stock's promotion.

48.	They intended to conceal the trail of funds transferred between the various co-conspirators, so instead of wiring money from one investor's account to another, they sold each other blocks of stock in the open market to finance the first round of marketing.

49.	Through settlement of these block trades, the Casey syndicate and their affiliated companies were able to obtain the first $1.5 million needed to pay promoter Next Media.

50.	Prior to these block trades of millions of shares, there was no market that existed for trading Luxeyard stock. At the time of these block trades, there was no other trading volume.

51.	The Defendants engaged in what is called a matched order.

52.	A matched order is a coordinated transaction in which an order for the sale of stock is entered with the knowledge that a contra buy order for substantially the same quantity of shares of the same stock, at substantially the same time and price, has been or will be entered by another person, with the intent that the orders will execute against each other.

53.	There is no market risk to the parties engaging in matched orders and the trades are not done for a legitimate economic purpose.

54.	Given the fact there was no trading of Luxeyard stock during this time frame, the Defendants and their co-conspirators could be sure that their matched orders would be a success.

55.	Buyers participating in the matched orders—including Sano Holdings—received shares they knew would be inflated through false advertising. The matched orders themselves increased the trading volume of LuxeYard stock, thereby increasing the price and making the stock more attractive to other potential buyers.

56. With money obtained from matched orders, Casey, Huttner and their co-conspirators were able to pay millions of dollars for the LuxeYard stock promotion.

57. They engaged in a sham mass-marketing campaign—touting LuxeYard as the next Facebook and ensuring readers that the LuxeYard stock price would soar. Next Media's spam e-mails and direct mailers claimed that investors would reap great rewards for buying LuxeYard stock while the price was relatively low. Some co-conspirators "hyped" the LuxeYard stock through online blogs and websites.

58. None of the promotions disclosed that there would be a coordinated, mass selling of the stock, in which the Defendants would participate.

59. From January through April of 2012, LuxeYard was engaged in private placement funding at $0.30 per share.

60. Unknown to LuxeYard and legitimate investors, Casey, Huttner and their co-conspirators undertook "gypsy swaps" in order to continue "investing" in LuxeYard. Their goal was to have the company continue functioning until their Pump and Dump plan was fully implemented.

61. Casey, Huttner and their co-conspirators sold shares received from the pump and dump scheme at prices ranging from $0.80 to $1.50, and used proceeds to invest in the private placement at a substantially reduced price.

62. In some instances, these investors in convertible debentures were bribed or subsidized by "free trading stock" in order to invest. They used ill-gotten funds to create the appearance of legitimate investment in LuxeYard.

63. These "gypsy swaps" also had the effect of causing other, unaffiliated and innocent third-parties to be induced into making private placement investments during this time frame. But these innocent investors had no knowledge of the "gypsy swap" funding in which the Defendants and their co-conspirators were engaged during the same round of financing.

### F.  The Coordinated Selling of LuxeYard Stock

64.     Potential investors would read promotional information regarding LuxeYard stock before viewing how LuxeYard stock was trading.  The recipients of the marketing materials would notice that the stock's trading volume was increasing while the price also continued to rise.  The recipients could not know about the matched orders and gypsy swaps so the trading volume and stock price would appear to justify the misleading statements made about LuxeYard stock.  This market activity would seemingly confirm that LuxeYard stock was well worth the price, even though it was based on a false and fraudulent foundation.

65.     Attracted to the liquidity and price upswing, thousands of investors who made direct investments into LuxeYard or purchased LuxeYard stock in the open market were fooled by the false, inflated trading volume and stock price that was created by the Defendants and their co-conspirators.

66.     Additionally, the false advertisements and misleading media campaign were created by the Defendants and their co-conspirators with the specific intent that innocent investors would act upon their misrepresentations.  These innocent investors suffered economic injury as a result of the Defendants' fraud.

67.     The Defendants and their co-conspirators knew when the public would receive the false mailers and email spam hyping the stock, and coordinated their sales of LuxeYard stock to coincide with receipt of the misleading advertising.

68.     After the mass-mailings, the Defendants no longer traded LuxeYard stock among themselves but sold stock to the unsuspecting public who was deceived through market manipulation.  This trading was coordinated and took place in a relatively short time frame.

69.     After selling some of their stock, Casey, Huttner and their co-conspirators used some of the proceeds to finance another round of false advertising campaigns.

70.     The Defendants then sold more LuxeYard stock and engaged a third round of misleading promotion, which was followed by more coordinated selling.

71.     During the first few weeks of April 2012, members of Original Shareholder Syndicate that financed Top Gear's purchase—including Kay Holdings—sold their shares.  After April 16, 2012,

other members of the pump and dump conspiracy (including Kevan Casey through his company Jinsun, Jonathan Friedlander through his company Equity Highrise, Scott Gann through his various "Bear" entities, Fredrick Huttner, Joseph Lee, Jonathan Camarillo, Jonathan Camarillo Trust, and Acadia Holdings) started selling shares in a coordinated manner.

72.     Upon information and belief, Sano Holdings sold its Luxeyard shares by no later than the beginning of August, 2012, within six months of acquisition.

73.     From April 1 to August 1, 2012, the Defendants and their co-conspirators received in excess of $30 million in total revenues from their pump and dump operation.

74.     Upon information and belief, Robert Wheat, Kay Holdings and Sano Holdings realized profits in excess of $ 250,000.00 from the sale of LuxeYard shares within six months of acquiring those shares.

## CAUSES OF ACTION

**Profit Disgorgement Pursuant to Section 16(b) of the Securities Exchange Act**

75.     Luxeyard repeats and incorporates herein by reference all of the allegations contained in the preceding paragraphs as though set forth in full.

76.     Section 16(b) of the Securities Exchange Act (the "Act"), 15. U.S.C. § 78p(b), permits a company to recover profits made by its "insiders" on certain purchase and sale transactions occurring during any period of less than six months. In relevant part, Section 16(b) reads as follows:

> For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer . . . within any period of less than six months, . . . shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction . . . . Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer . . . .

77.     The Act recognizes that the abuses it targets may be accomplished by persons acting not individually but in combination with others. *See* 15. U.S.C. § 78m(d)(3). SEC Rule 16a-1(a)(1) provides that, "[s]olely for purposes of determining whether a person is a beneficial owner of more than ten percent of any class of equity securities . . . the term 'beneficial owner' shall mean any

person who is deemed a beneficial owner pursuant to section 13(d) of the Act and the rules thereunder." 17 C.F.R. § 240.16a-1(a)(1). Section 13(d)(3) of the Act provides that "[w]hen two or more persons act as a partnership, limited partnership, *syndicate*, or other *group* for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes of this subsection." 15. U.S.C. § 78m(d)(3) (emphasis added).

78. SEC Rule 13d-5(b)(1) provides that "[w]hen two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of sections 13(d) and (g) of the Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by *any* such persons." 17 C.F.R. § 240.13d-5(b)(1) (emphasis added). Accordingly, under Section 13(d)(3), if two or more persons or entities agree to act together for any of the listed purposes, a "group" is formed.

79. The Defendants acted in concert with the other investors who purchased the shell company Top Gear.

80. The Defendants and their co-conspirators held more than 10% of the outstanding stock of Luxeyard.

81. The Defendants sold their LuxeYard shares within six-months of acquisition.

82. By doing so, the Defendants violated the Act. Regardless of their intentions—which were to willfully defraud LuxeYard investors and shareholders—the Defendants are strictly liable to Luxeyard for all profits made on their trades of Luxeyard stock.

83. Pursuant to Section 16(b), Luxeyard is entitled to recover any profits realized by the Defendants as a result of those sales.

84. Upon information and belief, the Defendants received in excess of $ 250,000.00 from their sales of LuxeYard stock.

**Conspiracy to Commit Fraud**

85. Luxeyard repeats and incorporates herein by reference all of the allegations contained in the preceding paragraphs as though set forth in full.

86. The Defendants had a meeting of the minds to commit fraud in connection with the purchase and sale of securities.

87. There were several purchases and sales of securities, including purchase of control of the shell corporation.

88. These transactions involved fraud, fraudulent nondisclosure, and/or violations of the securities laws and regulations, as well as the use of both the post service and interstate wire communications.

89. The Defendants failed to disclose their intent to manipulate LuxeYard stock. The Defendants failed to disclose their actual manipulation of LuxeYard stock, including matched orders, wash trades and gypsy swaps.

90. The Defendants failed to disclose their coordinated dealings with each other. The Defendants failed to disclose that they knew of the multi-million dollar misleading promotional campaign sent to LuxeYard stock purchasers.

91. The mailers, e-mails and internet blogs grossly exaggerated projections for LuxeYard stock that the Defendants knew would not be met because of the planned dump of their stock, which would drive the price down.

92. The Defendants made misrepresentations—through omission and commission—that they intended to be relied upon by LuxeYard and its shareholders.

93. LuxeYard and its shareholders did rely on the Defendants' misrepresentations. This reliance was reasonable based upon the knowledge available to them at the time. As a result of the Defendants' fraud, LuxeYard has suffered damages.

94. The Defendants and those acting in concert with the Defendants had a meeting of the minds to accomplish an unlawful pump and dump scheme and enrich themselves through market fraud. Consequently, the Defendants are jointly and severally liable to LuxeYard for the fraud.

**Aiding and Abetting**

95. Luxeyard repeats and incorporates herein by reference all of the allegations contained in the preceding paragraphs as though set forth in full.

96. The Defendants had knowledge of the pump and dump scheme and fraud involving LuxeYard stock.

97. The Defendants had the intent to assist the perpetrators of the pump and dump scheme in committing their fraud upon LuxeYard and its shareholders.

98. The Defendants assisted or encouraged the pump and dump perpetrators, which was a substantial factor in causing the pump and dump scheme and the injury to LuxeYard. Consequently, the Defendants are jointly and severally liable to LuxeYard for the fraud.

**Unjust Enrichment**

99. Luxeyard repeats and incorporates herein by reference all of the allegations contained in the preceding paragraphs as though set forth in full.

100. Additionally and/ or in the alternative to other counts, LuxeYard pleads for recovery under the doctrine of unjust enrichment.

101. LuxeYard's shareholders paid monies to the Defendants for shares, believing the price asked for by the Defendants represented the shares' true value and was not the result of the Defendants' manipulation and market fraud.

102. As a result of the Defendants' acts and omissions, the Defendants have unjustly enriched themselves and owe restitution to LuxeYard and its shareholders in the amount of all monies paid to the Defendants.

**Alter Ego/Piercing the Corporate Veil**

103. Luxeyard repeats and incorporates herein by reference all of the allegations contained in paragraphs 7 through 73 as though set forth in full.

104. Robert Wheat is vicariously liable for LuxeYard's damages under a theory of alter ego or piercing the corporate veil. The corporate forms of Defendants Kay Holdings and Sano Holdings should be disregarded because:

    a. the form were used as a sham to perpetuate a fraud;

     b. Robert Wheat dominated, influenced and controlled both Kay Holdings and Sano Holdings;
     c. Robert Wheat dominated, influenced and controlled the business affairs and operations of Kay Holdings and Sano Holdings, including company officers or executive management;
     d. Kay Holdings and Sano Holdings were mere shells and naked frameworks that Robert Wheat used as a conduit to conduct his personal business, property and affairs;
     e. Robert Wheat used the companies as his alter egos;
     f. the forms were used to justify a wrong;
     g. the corporations were and continue to be inadequately capitalized with the effect of creating an injustice;
     h. Robert Wheat caused the corporations to be used for the purpose of perpetuating an actual fraud; and
     i. Robert Wheat perpetuated an actual fraud on LuxeYard.

105. For any damages incurred by LuxeYard as a result of the unlawful pump and dump scheme, Robert Wheat is personally liable for the acts committed in the names of his sham corporations.

**Exemplary Damages**

106. Luxeyard repeats and incorporates herein by reference all of the allegations contained in paragraphs 7 through 73 as though set forth in full.

107. Exemplary damages are appropriate in this case and are needed to deter the Defendants and others from such conduct in the future.

08. The Defendants acted knowingly and willfully with respect to their pump and dump scheme.

109. Their conduct was deliberate and organized and amounts to multiple violations of felony criminal statutes, including mail fraud, wire fraud, money laundering, the Racketeer Influenced Corrupt Organizations Act, obstruction of justice, violations of SEC rules and regulations, and violations of the Financial Industry Regulatory Authority ("FINRA") rules and regulations. *See* 17 C.F.R. § 240.10b-5 (SEC Rule 10b-5 prohibiting fraud in connection with the purchase or sale of securities); 15 U.S.C. § 78j(b) (prohibiting unlawful short-selling and manipulative and deceptive securities-based swap agreements); 18 U.S.C. § 1961(1) (the Racketeer Influenced Corrupt Organizations Act); 15 U.S.C. § 77q (Section 17 of the Securities Act of 1933); 18 U.S.C. § 1346 (mail fraud and wire fraud); FINRA Conduct Rule 2310 (prohibiting unsuitable recommendations of securities sales or purchases).

## JURY DEMAND

110. LuxeYard demands a trial by jury and tenders the appropriate jury fee contemporaneous with the filing of this petition.

## PRAYER

111. LuxeYard prays that the Defendants be cited to appear and answer herein and upon final trial hereof, LuxeYard requests damages from the Defendants in excess of the minimum jurisdictional limits of the court, exemplary damages, costs of court, prejudgment interest, post judgment interest and such other and further relief to which LuxeYard may show itself to be justly entitled.

Dated this 9th day of July, 2015.

_____

William R. Kendall, Esq.
Nevada State Bar No. 3453
137 Mt. Rose Street
Reno, NV 89509
Phone: (775) 324-6464
Fax:    (775) 324-3735
email: kendalllaw@aol.com

Kevin T. Kennedy
Texas State Bar No. 24009053
Federal Bar No. 305324
2500 West Loop South, Suite 315
Houston, Texas 77027
(832) 303-3873
(713) 979-2003 (fax)
k.t.p.kennedy@gmail.com